Opinion issued August 16, 2012



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NOS. 01-11-00581-CR & 01-11-00582-CR

————————————

**WINSTON PERKINS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 23rd District Court**
**Brazoria County, Texas**
**Trial Court Case No. 63092**

# O P I N I O N

Appellant Winston Perkins appeals from judgments of conviction on two separate criminal offenses. A jury convicted him of improper visual recording and sentenced him to two years in jail for that offense. TEX. PENAL CODE ANN.

§ 21.15(b) (West 2011). The jury also convicted him of promotion of child pornography and sentenced him to imprisonment for nine years. TEX. PENAL CODE ANN. § 43.26(e) (West 2011). Perkins challenges both convictions on the grounds of sufficiency of the evidence. We affirm.

**Background**

C.T. was 16 years old and living with her mother in Freeport as her junior year of high school approached. Her mother needed surgery around the start of the school year, which prompted them to seek out another home where C.T. could stay so she could continue attending the same school. The Perkins household arose as a possible place for C.T. to stay because C.T.'s mother and Perkins's wife were both employed at the same local department store. C.T.'s mother introduced her daughter to Perkins and his wife, and then she decided to have C.T. live with the couple and their two children while she recuperated from surgery. C.T. had her own room in the Perkinses' house. On school days, Perkins routinely woke C.T. and the other children in the morning, and then C.T. would take a shower. Perkins's wife drove the children to school before heading to work.

Perkins's best friend of many years was Karl Gowan. They and their wives often socialized together. Gowan and his wife temporarily lived at the Perkinses' house during the summer before C.T. came to live there. During the period that

2

C.T. lived with the Perkins family, Perkins was having an affair with Gowan's wife. Perkins believed at that time that his wife was also having an affair.

In late October, Perkins revealed his affair during an argument with his wife. During that argument, Perkins went into C.T.'s room and lashed out at her for not telling him that his wife was also having an affair. Feeling hurt, C.T. immediately called her mother, who arranged for C.T. to leave the house that same night to live with someone else. Perkins and his wife together went to Gowan to tell him about the affair between Perkins and Gowan's wife. Gowan was upset by this information.

A couple of weeks later, Gowan gave two DVDs to C.T.'s aunt and uncle who, coincidentally, lived in his neighborhood. Gowan, who looked nervous, said that he was in the process of packing his car to leave town. One DVD, subsequently labeled "sink," had videorecordings that were made from a hole drilled into the cabinet underneath a bathroom sink in the Perkins home. The hole faced the shower. The other DVD, subsequently labeled "vent," had videos that were made from a vent located above the shower. The videos on both DVDs showed C.T. in the nude while shaving her legs and showering. The "sink" videos showed C.T. only from the waist down. The "vent" videos showed C.T. as she dressed and undressed.

After handing the DVDs to C.T.'s aunt and uncle, Gowan returned home. C.T.'s uncle called the police, who arrived at Gowan's house as he was packing his car. Gowan told the police that he had given the DVDs to C.T.'s aunt and uncle because he wanted to take revenge against Perkins for the affair.

The police obtained a search warrant for Perkins's house. They found a small-lens camera and digital switch box in the master bedroom. They also found cables running through the attic. When the police initially interviewed Perkins, he denied that he ever put a camera in the bathroom, recorded videos of C.T., or watched such videos. Over the course of the interviews, Perkins eventually admitted that he put a camera in the bathroom vent, explaining that he wanted to capture evidence of his wife's affair, but he maintained that he never installed a camera beneath the sink. He blamed Gowan for recording the videos of C.T. Perkins admitted to police that he viewed the "vent" videos at Gowan's house with Gowan and his wife, but he said that he told the Gowans that it was "wrong" and he left. At some point in the interview with police, Perkins stated that his life was over.

Perkins was charged with improper visual recording and promotion of child pornography. The jury convicted him of both counts, and it sentenced him to two years in jail for improper visual recording and nine years in prison for promotion of child pornography. Perkins appeals from both judgments.

**Analysis**

In his sole issue, Perkins argues that the evidence was legally insufficient to support the judgments on the counts of improper visual recording and promotion of child pornography. On the count of improper visual recording, he challenges the sufficiency of the evidence that he was the videographer. On the count of promotion of child pornography, his legal-sufficiency challenge goes to whether the images were "lewd," and to whether there was sufficient evidence that he gave the visual material to Gowan.

## I. Standard of review

In reviewing the legal sufficiency of the evidence to support a criminal conviction, a court of appeals will determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We measure the evidence "by the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). As the exclusive judge of the facts, the jury may believe or disbelieve all or any part of a witness's testimony. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). We presume that the fact finder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *See Jackson*, 443

U.S. at 326, 99 S. Ct. at 2793. On appeal we may not reevaluate the weight and credibility of the record evidence and thereby substitute our own judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). In reviewing the evidence, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Accordingly, we determine whether the necessary inferences to support the verdict are reasonable based upon the combined and cumulative force of all the evidence viewed in the light most favorable to the verdict. *Id.* at 16–17.

## II. Improper visual recording

With respect to the improper visual recording offense, Perkins contends that the evidence was legally insufficient to identify him as the person who recorded the videos. He points out that the videos themselves do not show who recorded them and that no one testified to having seen him make the recordings. The mere fact that he owned and sometimes possessed the camera, he argues, does not prove his involvement in recording the videos, given that testimony elicited at trial established that others had access to the camera.

The State points out that Perkins admitted to police that he placed the camera in the bathroom vent and that one of the videos captured the sound of Perkins's voice. In response to Perkins's attempt to blame Gowan for the

6

recordings, the State contends that the evidence showed that the videos were made in the mornings when Gowan did not have access to the house.

In *Cooper v. State*, 326 S.W.3d 757 (Tex. App.—Texarkana 2010, pet. granted and ref'd[*]), Cooper was convicted of creating an improper visual recording of women as they walked down the sidewalk. *See Cooper*, 326 S.W.3d at 758–59. No one testified at trial that they saw Cooper record the videos, but two witnesses testified that they identified him on the videos themselves. *Id.* at 760–61. The court of appeals reviewed the videos and did not see any part of the videographer's body. *Id.* at 762. The court also considered the circumstantial evidence that Cooper was the videographer, but it rejected the legal sufficiency of that evidence, explaining:

> Ownership of the camera proves ownership. Without more, it cannot prove beyond a reasonable doubt that the camera was used at a particular time by a particular person. There is no evidence that Cooper had sole possession of the location from which the videos were made. The evidence shows to the contrary. The uncontroverted evidence shows that at least several other people had access to both locations over an extended period of time.

---

[*] The Court of Criminal Appeals granted the State's petition on an issue related to the timing of the issuance of mandates by the court of appeals. *See Cooper v. State*, No. PD-0035-11, 2011 WL 2583519, at *1 (Tex. Crim. App. June 29, 2011) (per curiam, not designated for publication). The State's remaining grounds were refused. *See id.*

*Id.* at 762–63. The court concluded that a rational jury could not find beyond a reasonable doubt from this evidence that Cooper recorded the videos, and it reversed the conviction. *Id.* at 763.

As in *Cooper*, there is no direct evidence in this case that Perkins recorded the videos. However, the facts that Perkins owned the camera and had access to the location in which the videos were recorded are not the only circumstantial evidence indicating that he was the videographer. One police officer testified that Perkins admitted placing the camera in the same bathroom vent from which the "vent" videos were recorded. C.T. testified that Perkins was the only adult male living in the house during the period that she lived there. She also testified that she routinely took showers in the mornings, that one of the videos bears a time stamp of 6:32 a.m., and that, in accordance with the usual school-day routine, she heard Perkins's voice on one of the videos waking her up. The time of day is significant because C.T. stated that she never saw Gowan in the house in the morning on a school day. Also, Perkins's wife testified that her husband pawned a DVD recorder around the time that C.T. stopped living at their house. It is undisputed that DVDs bearing the improper visual recordings ended up in the possession of Perkins's best friend, Gowan. In an interview with police, Perkins admitted that he had viewed at least one of the videos with Gowan and his wife.

Combined with the evidence of the circumstances of the recordings, the fact that Perkins owned a DVD recorder during the time that C.T. was living with him supports an inference that he recorded the images and made the DVDs himself. We hold that when the cumulative force of this evidence is viewed in the light most favorable to the verdict, a rational jury could conclude beyond a reasonable doubt that Perkins was responsible for recording the videos of C.T. in the bathroom. *See Hooper*, 214 S.W.3d at 16–17. Accordingly, we overrule Perkins's issue with respect to the count of improper visual recording.

## III. Promotion of child pornography

Perkins advances two arguments challenging the legal sufficiency of the evidence establishing that he promoted child pornography. First, he argues that the videos did not constitute child pornography because they did not depict a "lewd exhibition of the genitals." Second, he argues that no evidence was presented at trial that he intentionally or knowingly possessed or promoted the videos.

### A. Lewd exhibition

It is a criminal offense in Texas to knowingly or intentionally promote, or possess with intent to promote, "visual material" constituting child pornography. TEX. PENAL CODE ANN. § 43.26(e). The statutory description of the illicit "visual material" at issue includes images that depict "sexual conduct," a term which is statutorily defined to include "lewd exhibition of the genitals." *Id.* §§ 43.25(a)(2),

9

43.26(b)(2). The indictment charged Perkins with "intentionally or knowingly promot[ing] by giving to another, namely, Karl Gowan, visual material that visually depicted . . . actual lewd exhibition of [a child's] genitals."

Perkins argues on appeal that the visual material at issue did not depict a "lewd exhibition." His specific arguments in this regard focus on whether the images can be considered "lewd," specifically referencing the six factors articulated in *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987) *and aff'd*, 813 F.2d 1231 (9th Cir. 1987). In *Dost*, the federal district court described factors used to evaluate "whether a visual depiction of a minor constitutes a 'lascivious exhibition of the genitals or pubic area' under [18 U.S.C.] § 2255(2)(E)." *Dost*, 636 F. Supp. at 832. The court observed that the factfinder should consider the following factors, among others that may be relevant in the particular case:

> 1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
>
> 2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;
>
> 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
>
> 4) whether the child is fully or partially clothed, or nude;
>
> 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Id.* These factors have been adopted by many state courts for analyzing analogous issues arising under state child pornography laws, including courts in Texas which have treated the term "lascivious" as used in the federal statute as synonymous with "lewd" as used in the Texas statute. *See, e.g.*, *Alexander v. State*, 906 S.W.2d 107, 110 (Tex. App.—Dallas 1995, no pet.).

Undefined statutory terms that have not acquired a technical meaning are interpreted according to their common usage. *See, e.g.*, *Kirsch v. State*, 357 S.W.3d 645, 650 (Tex. Crim. App. 2012). "Lewd" has a "common meaning that jurors can be fairly presumed to know and apply." *Tovar v. State*, 165 S.W.3d 785, 790 (Tex. App.—San Antonio 2005, no pet.). If the visual depiction is intended or designed to elicit a sexual response in the viewer, it is lewd. *Alexander*, 906 S.W.2d at 110 (citing *Dost*, 636 F. Supp. at 832). We agree with the other Texas courts of appeals which have applied the *Dost* factors as a framework for analyzing whether images could be considered "lewd" for purposes of the child pornography laws.

Perkins does not dispute that the images depict the exhibition of C.T.'s genitals; the only issue he raises as to whether the "visual material" at issue falls within the proscriptive scope of the Penal Code is whether the exhibition as depicted in the videos was "lewd." *See* TEX. PENAL CODE ANN. § 43.25(a)(2).

11

Referencing the *Dost* factors, Perkins contends that C.T.'s genitals were not the focus of the videos. He notes that C.T. was not inappropriately dressed, nor was she posing unnaturally or in a sexually suggestive manner. He also argues that the images contain no suggestion of sexual coyness or a willingness to engage in sexual activity, and he asserts that they "do not appear to be intended or designed to elicit a sexual response in the viewer."

The State responds by emphasizing that the "sink" DVD had videos of C.T. from the waist down, and they therefore depicted a lewd exhibition of the genitals. The State contends that the videos had no other apparent subject matter than C.T.'s nude or partially nude body. It further argues that the fact that Perkins watched the videos with the Gowans demonstrates that the videos appeal to prurient, voyeuristic interests.

It is undisputed that the "sink" videos show C.T. in the shower from the waist down and that the "vent" videos show her in the nude from the ceiling. It is also undisputed that the videos depict C.T. as she undresses, showers, and shaves in the bathroom, and that they have no other apparent subject matter. The arguments advanced by Perkins essentially emphasize the innocent circumstances depicted, considered solely from the perspective of C.T. Certainly, there is nothing inherently lewd about being nude while engaged in ordinary personal hygiene under circumstances that are reasonably understood to be entirely private. But

12

Perkins's arguments entirely ignore the factors that make the images objectionable—the invasion of personal privacy required to obtain the images and the exploitation of an innocent child victim. Jurors are permitted to rely on their common sense to conclude that these images of a teenage girl—who had undressed in the belief that she had privacy in the bathroom—were created and preserved to appeal to deviant and voyeuristic interests of the viewer, and thus the images are intended or designed to elicit a sexual response. *Cf. United States v. Wolf*, 890 F.2d 241, 243, 247 (10th Cir. 1989) (holding that the image of partially nude sleeping child could constitute a "lascivious exhibition" for the purposes of 18 U.S.C. § 2256); *State v. Myers*, 207 P.3d 1105, 1113 (N.M. 2009) (holding that images of children's genitals taken from a hidden camera as they used a toilet "had a voyeuristic and deviant quality" such that fact finder could have found that they were "lewd"); *People v. Sven*, 848 N.E.2d 228, 239 (Ill. App. Ct. 2006) (concluding that video depicting nude teenage girl bathing infant put viewer into "role of voyeur," thus rendering the images lewd). Both the objective content of the images and the circumstances of their creation contribute to their voyeuristic quality, and a rational jury could have determined such images to be lewd.

Moreover, the evidence adduced at trial supports an inference that Perkins recognized the lewdness of the videos. Perkins told police that he viewed the "vent" videos with Gowan and his wife at their house. He said that when he saw

13

the videos, he told the Gowans that he does not "look at that stuff" and that it was "wrong." Regardless of whether this exchange actually occurred, the fact that Perkins told police that he objected to the videos could indicate his understanding that the images were intended or designed to elicit a sexual response in the viewer—that is, they were lewd.

We hold that a rational jury could conclude from this evidence that the videos were made with the intent to arouse a sexual response in the viewer and were therefore lewd. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

## B. Promotion

Within the meaning of the Penal Code's provision concerning promotion of child pornography, to "promote" child pornography includes to "give" such material to another person. TEX. PENAL CODE ANN. §§ 43.25(a)(5), 43.26(b)(2). Perkins was charged with this form of promotion of child pornography.

There is no direct evidence that Perkins gave the DVDs to Gowan. However, as previously discussed, the evidence at trial was legally sufficient to support the conclusion that Perkins recorded the videos. Moreover, undisputed evidence at trial established that Gowan possessed the DVDs before giving them to C.T.'s aunt and uncle. Having concluded that Perkins made the DVDs that ended up in his best friend's possession, the jury could rationally find that Perkins gave him the DVDs. We hold that when the combined force of this evidence is viewed

14

in the light most favorable to the verdict, a rational jury could conclude beyond a reasonable doubt that Perkins gave the DVDs to Gowan.  *See Hooper*, 214 S.W.3d at 16–17.

We overrule Perkins's issue with respect to the offense of promotion of child pornography.

**Conclusion**

We affirm the judgments of the trial court.


Michael Massengale
Justice

Panel consists of Justices Bland, Massengale, and Brown.

Publish.  TEX. R. APP. P. 47.2(b).